CITY OF PARAGOULD *v.* INTERNATIONAL POWER
MACHINERY CO.

5-2469—349 S. W. 2d.332

Opinion delivered September 25, 1961.

*Kirsch, Cathey & Brown,* for appellant.

*Cecil Grooms,* for appellee.

GEORGE ROSE SMITH, J. This is a suit by the city
of Paragould and the commissioners of its municipal
light plant to recover $20,000 damages for breach of

warranty in a contract by which the appellee, International Power Machinery Company, sold a secondhand diesel-powered generator to the city for $45,000. The city contends that the seller warranted the generator's diesel engine to have been manufactured in 1950, but it was actually built in 1944. The chancellor held against the city upon two grounds: (a) There was no reliance upon the warranty, since the chancellor found that the city's agents discovered the truth before entering into the transaction; and (b) the city was not damaged, since the generator was worth more than the city paid for it.

The first disputed question is whether there was an express warranty. International is a small family corporation, domiciled in Cleveland, Ohio, and engaged in buying and selling used power machinery like that involved in this case. In February of 1960 International bought this generator from a Canadian power company for $18,000 in Canadian money, which was equal to $18,967.50 in American money. International's president, Sam W. Kern, knew when he bought the 1950 generator that it was powered by a 1944 Fairbanks-Morse engine.

In March International mailed to all public and private power companies in the United States a brief printed advertisement inviting inquiries about the unit, which was described as "Installed 1950—Excellent condition—Can be shown in operation." When this circular was received at the Paragould light plant the superintendent, J. C. Holland, telephoned Kern for additional information about the unit. Following that conversation Kern sent Holland a letter, dated March 25, 1960, in which the generator and engine were formally offered to the city for $50,000. After a detailed description of the generator and the engine the offer contained this language: "New 1950—Excellent condition—Can be shown in operation."

The light plant commissioners were interested in the unit and sent representatives to Canada to inspect the machinery. The inspection party consisted of the

superintendent Holland, his plant foreman Hagen, and one of the commissioners. Kern met the inspectors in Chicago and accompanied them to Canada. There Holland and Hagen were satisfied with the operation of the unit, but they asked that certain auxiliary equipment be changed. Kern said that he would find out the cost of the requested auxiliaries and communicate that information.

On April 15, 1960, Kern sent the light plant another formal offer with which he enclosed quotations from the Fairbanks-Morse Company showing that the auxiliaries would cost $4,304.35. The letter stated: ''We have agreed to assume the cost of these auxiliaries and we accordingly allow a deduction of $5,000 from the purchase price of the 1136 KW Fairbanks-Morse diesel unit, submitted to you in our letter of March 25, 1960.'' This letter then described the unit in substantially the same language as the earlier letter, but the descriptive remarks beginning ''New 1950,'' etc., were omitted.

The city accepted this offer and made a down payment of one-fourth of the purchase price, as required by the seller's letter. Before the unit reached Paragould by rail the city learned from a Fairbanks-Morse salesman that the engine, instead of having been made in 1950, was a Navy surplus marine engine that had been manufactured under wartime conditions in 1944. Kern refused to rescind the contract, and the city elected to pay the balance of the purchase price under protest and bring suit for damages. The suit was filed in equity to enable the city to impound, by equitable garnishment, $20,000 of the purchase money.

We are of the opinion that International expressly warranted that the diesel engine had been manufactured in 1950. The Uniform Sales Act defines an express warranty in this language: ''Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon.''

Ark. Stats. 1947, § 68-1412. It seems plain enough that International's statement that the unit was new in 1950 was an affirmation of fact having a natural tendency to induce the city to purchase the unit. In fact, the statement could have been made for no other purpose.

We are not impressed by the appellee's insistence that its offer of April 15 so completely superseded the earlier offer that the city was not entitled to rely upon the March 25 letter. The revised offer contained in the second letter referred to the purchase price "submitted to you in our letter of March 25, 1960," so it is evident that the seller meant for the city to consider both letters. Furthermore, the April 15 letter contained no language constituting a withdrawal of the warranty previously made. *Associated Seed Growers, Inc.* v. *Johnson,* 227 Ark. 235, 297 S. W. 2d 934; *Kansas City Bolt & Nut Co.* v. *Rodd,* 6th Cir., 220 Fed. 750.

The second question is whether the city's inspection prevented it from relying on the warranty. It is conceded that an inspection does not preclude reliance upon an express warranty if the true facts are not discovered by means of the inspection. *Saunders* v. *Cowl,* 201 Minn. 574, 277 N. W. 12; *Bregman Screen & Lbr. Co.* v. *Bechefsky,* 16 N. J. Super. 35, 83 A. 2d 804. Hence the question is whether the city's representatives learned during their trip to Canada that the diesel engine had been built in 1944.

It is not contended that Kern ever volunteered this information, though he knew it. It is not indicated that the city's inspectors were so familiar with Fairbanks-Morse engines that they could recognize a 1944 engine merely by examining it. This engine, however, admittedly had a nameplate which recited, among other things, that it had been manufactured in 1944. The pivotal question is whether the city's representatives read that nameplate.

The testimony of those present is in direct conflict. Both Holland and Hagen, the two qualified inspectors, say that they did not see the nameplate. This testimony is not inherently improbable, even though the inspection

lasted for four or five hours. The generating unit is an enormous piece of equipment. The nameplate in question was four by six inches in size, was mounted near the top of the engine, from 6½ to 9 feet above floor level, and was partly obscured by a horizontal rod in front of it. There were three other nameplates on the unit, below eye level, and none of them gave the date of manufacture. Holland and Hagen were mainly concerned with the unit's performance. The most important part of the prolonged inspection upon a cold Canadian day was devoted to starting the engine and warming it up sufficiently for it to run at about 60 per cent of full capacity. Of course the inspection was not undertaken for the purpose of determining the year of manufacture.

Kern testified that he talked to Hagen during the inspection, and Hagen said that he recognized the engine as a war surplus marine engine, one of the first ones made. Kern says that Holland made a similar statement on the trip back to Chicago. Hagen and Holland deny this testimony.

In his memorandum opinion the chancellor found that Hagen and Holland actually saw (and presumably read) the nameplate. He based this finding almost entirely upon the fact that they examined an operating lever near the plate. The chancellor concluded that their eyes must have been focused upon the general area of the nameplate and that they must have seen it.

We consider this finding to be against the weight of the evidence. The contemporary and subsequent conduct of all the persons involved so strongly supports the Holland-Hagen testimony that we are firmly convinced of its veracity. Several circumstances tend to confirm this conclusion:

(a) Kern does not suggest that either Holland or Hagen displayed the slightest surprise or concern upon finding that the engine was a wartime surplus model instead of the later model that they came to see. It does not seem likely that these men would have so readily

acquiesced in a discovery that was decidedly detrimental to the city.

(b)   After the inspectors returned to Paragould and reported their findings the minutes of the commissioners' meeting on April 18 recited that the commission "approved the purchase of a 1950 engine (Fairbanks-Morse) that our employees had inspected at Saskatchewan, Canada." We do not regard these minutes as inadmissible self-serving statements, since the commissioners then had no reason to fabricate favorable proof. The minutes were admissible as a public record. Wigmore on Evidence (3d Ed.), § 1639; McQuillin on Municipal Corporations (3d Ed.), § 14.05. The reference to a 1950 engine tends to rebut the suggestion that the inspectors learned the truth in Canada.

(c)   Kern says that when he prepared the offer of April 15 he examined his earlier letter and discovered his error in having described the unit as "New 1950." He sought to correct the error by making no reference to the date of manufacture in his second offer. We are inclined to think that if Holland and Hagen had both indicated their knowledge of the true date of manufacture in the course of the inspection trip Kern would not have hesitated to act upon that favorable circumstance by inserting the correct date in the April 15 letter.

(d)   When the city discovered the truth its attorneys wrote a letter to Kern, asking that the transaction be rescinded. In reply to that demand Kern wrote in part as follows: "The date engine was built and serial number appear on the nameplate of the engine .and was openly displayed at time of inspection." Kern said nothing whatever about the inspectors' having actually discovered the fact that the engine was built in 1944. We find it impossible to believe that Kern would not have emphasized such admissions on the part of Holland and Hagen if they had really been made.

The only fact that tends to support Kern's testimony is the city's action in asking, after the truth was discovered, that International in effect reduce the pur-

chase price by reimbursing the city for the expense of the inspection trip. After studying the record as a whole, however, we are convinced that the weight of the evidence supports the view that Holland and Hagen did not read the rather inconspicuous plate in the course of their inspection.

The final question is the extent of the city's damages. Before attempting to use the generating unit the city sent it to the Fairbanks-Morse plant in Wisconsin. There it was rebuilt at a cost to the city of more than $40,000. The rebuilt engine, however, was the equivalent of a 1960 engine and also included extra features such as a dual fuel arrangement. Consequently the city's obligation to the Fairbanks-Morse Company does not represent the bare cost of transforming a 1944 engine into a 1950 model.

There is testimony, not undisputed, that what the city now has is worth more than its total payments to International and to Fairbanks-Morse. We do not agree with the chancellor's conclusion that such proof shows that the city has not been damaged. If the city had actually received a 1950 engine it is shown by undisputed testimony that the cost of rebuilding the unit would have been substantially less than it actually was. To that extent the city has suffered a loss within the terms of the Sales Act. Ark. Stats., § 68-1469 (6).

The estimates of the city's damages are so hopelessly at variance that they cannot be reconciled. Kern, who had many years of experience in buying and selling used power machinery, testified that a 1950 engine would have been worth only about $2,500 more than a 1944 model. He thought that the city received full value, even though he had bought the 1944 engine in the open market for less than $25,000, counting his loading and freight expense.

The Fairbanks-Morse salesman recited bare figures, without any supporting data, that indicated it would cost at least $21,650 to convert a 1944 engine to the equivalent of a 1950 model. The chancellor stated in his

memorandum that all the witnesses appeared to be biased in favor of one side or the other.

In attempting, upon trial *de novo*, to arrive at a proper estimate of the city's loss we are beset with much the same difficulty as we encountered in *Magnolia Pipe Line Co.* v. *Ark. State Game & Fish Comm.*, 218 Ark. 932, 240 S. W. 2d 857. After studying the record it is our collective best judgment that an award of $12,000 will compensate the city's loss and accomplish substantial justice in the case. The cause will be remanded for the entry of a decree consistent with this opinion.

Reversed.