## THE LITTLE ROCK SCHOOL DISTRICT
### of Pulaski County, Arkansas *v.* CELOTEX CORPORATION et al

78-137                                          574 S.W. 2d 669

### Opinion delivered December 18, 1978
### (In Banc)
[Supplemental Order on Petition for Rehearing Granted in Part and Denied in Part, February 19, 1979.]

758

*Friday, Eldredge & Clark,* by: *Michael G. Thompson* and *G. Ross Smith,* for appellant.

*Rose, Nash, Williamson, Carroll, Clay & Giroir,* by: *Phillip Carroll; Laser, Sharp, Haley, Young & Huckabay, P.A.,* by: *Jacob Sharp, Jr.,* and *Peter B. Heister;* and *Wright, Lindsey & Jennings,* for appellees.

GEORGE HOWARD, JR., Justice. This appeal involves an action, instituted in the Pulaski Circuit Court, by the Little Rock School District for breach of both an express and implied warranties and negligence, in the construction of a roof for a new high school facility, against the following firms:

(a) Matson, Inc., a general contractor, hereinafter called Matson;

(b) Ginocchio, Cromwell, Carter and Neyland, Inc., an architectural firm that prepared the plans and specifications for the project, hereafter referred to as Cromwell;

(c) Knox Gill Company, a sub-contractor who performed the roofing work and sold the roofing materials, hereinafter designated as Knox; and,

(d) Celotex Corporation, the manufacturer of the roofing material used in constructing the roof.

We are to determine essentially whether the trial court committed error in holding, as a matter of law, that there was neither an expressed nor an implied warranty involved; and that the statute of limitations rendered the negligence claim unenforceable and that limitations would be equally effective against any warranties had there been any warranties involved. The trial court's holding resulted in the following:

1. Summary judgment granted in behalf of Matson during a pre-trial conference on the ground that the District's action was barred by statute of limitations;

2. Summary judgment granted to Knox and Cromwell immediately prior to trial on the theory that the District's action was barred by the statute of limitations;

3. Summary judgment to Celotex on the negligence claim immediately prior to trial; and,

4. Directed a verdict in favor of Celotex on the issue of expressed and implied warranties at the close of the District's case.[1]

## THE FACTS

On November 1, 1966, the District entered into a contract with Matson, as general contractor, for the construction of Parkview High School. Matson entered into a sub-contract with Knox for performance of the roofing work, for a total consideration of $77,859.00. The roofing materials, also referred to as "roofing system," used in the construction of the roof was a "celotex two-ply 20 year roof" containing a 20 year bond to cover defects caused by normal wear and tear. The roofing material was sold by Knox, but was manufactured and marketed by Celotex.

The roofing system consisted of two plies of coated roofing felts which would be used in lieu of the traditional four-plies. Celotex advertised extensively that this system was equivalent to the traditional four-ply system.

Cromwell prepared the plans and specifications for the facility, including the roofing specification based on information supplied to Cromwell by Celotex regarding the integrity of the two-ply roofing system in meeting the District's job requirements and needs.

---

[1]None of the parties appealed from the summary judgment granted to Matson.

The District appealed from the judgments dismissing its action against Knox, Cromwell and Celotex. Celotex cross appealed from the judgment dismissing its third party complaint against Cromwell and Knox in order to preserve its claim for contribution or indemnity in the event this Court should reverse the trial court's action in dismissing the District's case against Celotex. Knox also cross appealed to preserve its claim, in case of a reversal, against Cromwell and Celotex.

The structure was completed in 1968, and almost immediately, the District discovered leaks in the roof. These leaks continued intermittently from 1968 to March 25, 1975. During the period between 1968 and March 25, 1975, numerous repairs were made to the roof, through the joint activity of Cromwell and Knox and, for a substantial part of the period, by Celotex.[2] However, the District was led to believe that the general condition of the roof was excellent; and that in spite of the numerous problems registered about the roofing system, it was feasible that the roof would last through its normal expectancy of 20 years.[3]

On March 25, 1975, Cromwell advised the District that the Celotex two-ply roofing system was a failure and had to

---

[2]Celotex sought to disclaim any responsibility for leaks in the roof due to splitting of the roofing membrand in a letter to Knox dated April 6, 1971. However, it does not appear that Celotex took any steps to advise the District of its posture relative to the problems that the District was realizing between April 6, 1971, and March 25, 1975.

[3]The following is a part of a progress report dated February 18, 1972, made by Cromwell to the District regarding roofing repairs:

"*Administration* (Unit 4) — Repairs were made to evident blisters and splits. . . . "

"*Library* (Unit 5) — Repairs were made to evident blisters and splits. Two plies of #15 tarred felt were placed over the existing membrane. . . . "

"*Language, Arts and Social Sciences* (Unit 8) — Approximately 90% of this roof area has been reworked. . . . "

"*Fine Arts* (Unit 9) — This area was re-worked as required, including spot patching of all blisters and defects. . . . "

"*Dining* (Unit 6) — This roof area has been completely reworked except for the roofing within the penthouse fence."

"*Math and Science* (Unit 2) — Approximately 25 squares of roofing were repaired over the locker areas. . . . Repairs were also made at a split in this area by installing a composition flashing slip joint over the split."

"*Other Roof Area:* — The balance of the roof areas were repaired where blisters and other defects were evident. The repairs including cutting out the blister or defect, spot patching and re-coating with pitch and gravel surfacing."

On February 22, 1974, Cromwell advised the District as follows in a communication addressed to the Assistant Superintendent:

"I have reviewed the history of this roofing system. Our position at the present time remains the same. That is, there is insufficient evidence to conclude that there is a total failure in the roofing system.

be replaced. The District took steps to have the entire roof removed and replaced by a different contractor at a cost of $155,120.00.

The District instituted its lawsuit, on March, 25, 1975, against Matson, Knox and Celotex.

## HOLDING OF THE TRIAL COURT

In granting a directed verdict in behalf of Celotex, at the close of the District's case, the court stated, in part:

"In summary, for the purpose of review, the decision to direct a verdict for defendant is based on the following principles.

"1. There was no express warranty. A breach of contract was barred by the Statute of Limitations.

"2. There was an implied warranty of fitness but again this action was brought some seven years later after installation and thus the Statute of Limitations applied.

"3. Plaintiffs strongly urge that the case of Louisville Silo and Tank Co. v. Thweatt, 174 Ark. 437, supports its theory that the Statute of Limitations is tolled by the making of repairs. I disagree because in said case an express warranty was involved.

"4. Plaintiff's relief in this matter, after four years from date of installation, must be restricted to the remedial repairs under provisions of the bond."[4]

The failures that have occurred are due to a weakness in the system and a specific area weakness.

. . .

"At the present time we feel that this system of notification and repairs is the best procedure that can be followed unless more dramatic failures occur."

[4]The 20 year guaranty bond, dated April 26, 1968, submitted to the District in connection with the two-ply roofing system limits Celotex's liability to the sum of $10,350.00, while, on the other hand, the bond contains the following statement:

## THE DECISION

## EXPRESS WARRANTY

It is clear from the evidence in this record that the plans and specifications, relating to the roof, were prepared by Cromwell, with input from Celotex in the form of information regarding the merits of Celotex's two-ply roofing system, to meet the requirement of the District, which had traditionally used the four-ply system, for a roof with a durable life span of 20 years.

Literature and brochures supplied by Celotex, in connection with its advertising and promotion program of the two-ply system, contain, among other things, the following affirmations and statements as to the quality and condition of the two-ply roofing system:

1. $1 + 1 = 4$. Meaning that two plies of Celotex's bond ply are equivalent to four plies of conventional roofing.

2. You are assured of GREATER QUALITY, WEATHER PROTECTION and LONG LIFE than ever before possible.

3. Provides excellent weather protection even before the surface operation is complete.

4. You get what you specify.

---

"Whereas, Celotex, Principal, hereby guarantees, as set forth herein, that during a period of twenty years from said date of completion of roof, Celotex will at its own expense repair or cause to be repaired, leaks developing in a Roof which are caused by ordinary wear and tear by the elements. . . . "

Celotex, by letter dated April 6, 1971, to Knox, among other things, made the following statement relative to its responsibility under the 20 year guaranty bond:

"I have discussed the condition of the roof and Mr. Parker's report with the people in Tampa and a decision has been reached that under the terms of the bond, The Celotex Corporation must disclaim any responsibility for leaks in the roof due to splitting of the roofing membrane."

5. Bonded for up to 20 years.

6. The revolutionary new system that takes the guess work out of built-up roofing.

7. A Smash Hit!

8. Trouble-free roofing system in a large number of installations.

Robert Dugger, who was regional manager of "Built-up Roofing" for ten years and is currently serving as manager of Architectural Services for Celotex, testified that the roof in question was bonded as a 20 year roof; that Celotex took the position and so advised its customers that the two-ply system would give them a roof comparable in quality and in terms of useful life similar to that offered by the traditional four-ply system.

Mr. Dugger also testified, with reference to problems encountered with the two-ply system:

"A. The rate of failure, of course, relates directly to the sale of the product and, naturally, the rate of problems with the bond-ply for the last few years have been greater than with any other system primarily because during the period of, say '66, '67, '68, on through those years basically that was all we were selling so the rate of problems can always be connected directly with the product you've sold.

. . .

"A. I would say if there is a problem, a pattern, it would probably be blistering. Roofing generally fails for two reasons, blistering and splitting.[5]

. . .

---

[5]Mr. Dugger also testified that during 1963 and 1964, Celotex conducted field tests on its two-ply system and that it was discovered that problems with the system can develop from the installation of the roofing by unskilled people employed by a roofing contractor.

"A. Bond-ply has approximately half of the tensile strength of a four-ply system. Maybe I should say tensile strength to keep it in the proper perspective."

Mr. Duggar further testified that to his knowledge, there were between 50 and 60 lawsuits pending against Celotex throughout the United States involving its two-ply roofing system; and that some of the suits were filed as early as the latter 1960's.

It is well recognized that an express warranty may be inferred from statements and affirmations by a seller relating to the quality and condition of his goods, which induce the purchase and on which the buyer relies and the seller intended that the buyer should do so. Furthermore, when, under circumstances surrounding a sale such as we have in the instant case, intent or motive becomes an issue, in a claim of a purported express warranty as having been made, and, especially where the parties involved have assumed conflicting postures regarding the facts and circumstances, the question or issue is generally one of fact; thus, the matter falls within the province of the jury for resolution. However, it is plain, if there is no conflict in the evidence and only one reasonable inference can be drawn from the evidence, intent and motive may become a question of law to be determined by the court. *City of Paragould* v. *International Power & Machinery Company*, 233 Ark. 872, 349 S.W. 2d 332 (1961); *See Also: Lloyd* v. *James*, 198 Ark. 255, 128 S.W. 2d 1019 (1939); *Ives* v. *Anderson Engine & Foundry Co.*, 173 Ark. 112, 292 S.W. 111 (1927).

The trial court, in articulating its finding that Celotex had not made an express warranty, stated in part:

"Express Warranty: It means to be explicit which is defined as characterized by full, clear expression without vagueness or ambiguity — leaving nothing to be implied. It is a plain distinct expression that leaves no need for the reader or hearer to infer anything. In this case, the only evidence relating to warranty is to be found in publications of the defendant. Nothing in these publications is explicit and certainly leaves a reader or hearer to infer or draw their own conclusions and interpretations. This is made clear when numerous questions

were asked of expert witnesses as to their individual understanding of what a twenty year flat bond roof means. After hearing the evidence pertaining to roofing problems and the many and various reasons for such problems, it is understandable why bonds for repairs are made available rather than an explicit guarantee for a twenty year period irrespective of cause. The Court concludes, as a matter of law, there was no express warranty in this case."

We perceive that the trial court's proscriptive definition of an express warranty is not compatible not only with the case law cited herein, but is diametrically opposed to Arkansas's Uniform Commercial Code in delineating circumstances giving credence to express warranties. For example, relevant parts of Ark. Stat. Ann. § 85-2-313 provide:

"(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

. . .

"(2) It is not necessary to the creation of an express warranty that the Seller use formal words such as 'Warrant' or 'Guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the Seller's opinion or commendation of the goods does not create a warranty."

After carefully reviewing the record before us, which contains numerous exhibits, we are persuaded that it cannot be said that the evidence or the posture taken by the parties is

not conflicting, as to whether or not the advertisement, affirmations and statements made by Celotex were a basis for an express warranty. Moreover, it cannot be said that credibility of witnesses will not be a determinative factor in concluding whether or not the purported statements and affirmations were designed to, and if in fact did, induce the District or its representatives to purchase the two-ply system. We conclude, therefore, that the trial court committed error in directing a verdict in favor of Celotex on the District's claim of express warranty. We are persuaded that the issue should have been submitted to the jury for resolution, for it is plain that the District made a *prima facie* case.

## LIMITATIONS

We further conclude that the issue of limitations on the District's claims for damages presented a question of fact, under the circumstances existing in this case, thus, the jury should have been afforded an opportunity to determine whether or not the conduct of Knox, Cromwell and Celotex tolled the statute of limitations by their joint efforts to repair the roof between 1968 and March 25, 1975. *See: Louisville Silo & Tank Co. v. Thweatt,* 174 Ark. 437, 295 S.W. 710 (1927), where we stated:

> "We hold therefore that, while the statute of limitations ordinarily begins to run against an action for breach of warranty upon the sale and delivery of a chattel which does not comply with the warranty, yet the statute is tolled so long as the vendor insists that the defect can be repaired and is attempting to do so. . . . "

## IMPLIED WARRANTY

We are persuaded that our case, *General Motors Corporation v. Tate,* 257 Ark. 347, 516 S.W. 2d 602 (1947), is dispositive of the issue of implied warranty of fitness and, accordingly, we affirm the trial court in holding that an implied warranty of fitness cannot explicitly extend to future performance. We, therefore, affirm the trial court as to this issue, but as to all other issues tendered in this appeal, we reverse.

Reversed.

GEORGE ROSE SMITH and FOGLEMAN, JJ., dissent.

GEORGE ROSE SMITH, Justice, dissenting. There certainly was no express warranty in writing. To the contrary, the circumstances absolutely contradict and negate that possibility. As part of the bargain Celotex furnished a surety bond, with Aetna Casualty & Surety Company as surety, guaranteeing that for a period of 20 years leaks would be repaired by Celotex, up to a maximum expenditure of $10,350. The school district paid a $2,070 premium for that "20-year Guaranty Bond." When two contracts are executed as part of the same transaction they are to be construed together, as one instrument. *Gowen* v. *Sullins,* 212 Ark. 824, 208 S.W. 2d 450 (1948). How can it be supposed that the parties were agreeing upon a 20-year express warranty when at the very same time the school was paying a substantial premium for a service contract by which Celotex bound itself to repair any leaks, up to a total expenditure of $10,350?

With respect to the possibility of a parol warranty, the majority opinion discusses "affirmations and statements" in literature and brochures supplied by Celotex in its advertising and promotion program. The opinion then lists eight numbered statements which apparently are considered by the majority to amount to an express warranty.

There are two insurmountable obstacles in the path of the majority's reasoning. First, the statements were mere advertising which appeared on the jacket of a phonograph record that Barrett, Celotex's predecessor, used promotionally. The statements are nothing more than a seller's commendation or "puffing" of its own goods, which do not amount to a warranty under the Uniform Commercial Code. Ark. Stat. Ann. § 85-2-313 (2) (Add. 1961). Indeed, the only positive statement among the enumerated eight is that two plies of Celotex's bond ply are the equivalent of four plies of conventional roofing. Even so, there is no proof whatever that a conventional four-ply roof is warranted to last for 20 years. Quite the opposite, such roofs appear at most to be accompanied by a surety bond such as the one offered by Celotex with its two-ply roof. So the two were apparently equivalent, as they both qualified for the same kind of guaranty bond.

Second, there is no showing that the architect, the contractor, or the school district ever saw the advertisement stressed by the majority, much less is it shown that any of those contracting parties relied upon the advertisement in deciding to use the two-ply roofing system. Yet the fact now develops, according to the majority opinion, that the statements in the unseen advertising matter constituted an express contract between the parties, upon which their minds met and came to an agreement. I simply do not see how a court can seriously reach such a conclusion and therefore record my dissent.

FOGLEMAN, J., joins in this dissent.

---

Supplemental Order on Petition
for Rehearing

78-137                                           576 S.W. 2d 709

February 19, 1979

PER CURIAM. The petitition for rehearing filed by the architects, Cromwell, Neyland, Truemper, Levy and Gatchall, Inc., is granted, for the reason that the only cause of action asserted against them is based upon negligent design, not breach of warranty, and that action is barred by the statute of limitations. The other petitions for rehearing are denied.

HARRIS, C.J., dissents.

BYRD, J., dissents.

SMITH and FOGLEMAN, JJ., would grant rehearing to all appellants.

CONLEY BYRD, Justice, dissenting. One of the troubles with per curiam orders is that like Mother Hubbard's dress, they cover everything and tell nothing. The per-curiam by the majority in holding that the statute, Ark. Stat. Ann. § 37-237 (Acts 1967, No. 42), has run against the architects, neglect to state that although the architect certified the building as complete in 1968 he continued to act on the roofing matter on the following days, to-wit:

2-11-69

7-28-69

11-09-69

11-17-70

12-23-70

12-29-70

2-01-71

2-09-71

2-18-71

3-04-71

3-23-71

4-27-71

6-04-71

6-24-71

8-10-71

8-30-71

10-01-71

2-18-72

11-02-73

12-15-73

1-04-74

1-08-74

1-18-74

2-22-74

2-27-75

3-18-75

3-26-75

As late as 11-2-73 the architect was "pleased with the general appearance of the roof and (Knox Gill's) concern for keeping the building watertight." It was not until 3-26-75 that the architect concluded that the roof had failed. It was only when the school board made demand upon Celotex that they learned of the fact that the roof may have been negligently designed.

Since the architect remained in the same fiduciary capacity to the school board at all times and consistently pointed the finger at Celotex and Knox Gill for the trouble with the leaks, I submit that such conduct in law amounts to concealment of the fact that there was anything wrong with the design. In such situations the courts of this nation almost universally hold that such conduct tolls the running of the statute of limitations. The reason for so holding is stated in 51 Am. Jur. 2d Limitation of Actions § 147 as follows:

"The reasoning adopted in support of the general rule is that to hold that the statute of limitations ran in favor of a person who had concealed the cause of action under such circumstances would be to permit the defendant to take advantage of his own wrong and to sus-

tain a defense of which in good conscience he ought not to be permitted to avail himself. . . ."

With reference to whether or not there was a concealment, *51 Am. Jr. 2d Limieation of Actions* § 149 points out that where ". . . there are fiduciary or confidential relations between the parties, there needs to be no evidence of a fraudulent concealment other than that implied from the transaction itself."

For the reasons herein stated, I respectfully dissent from the majority's per curiam order stating that the statute had run against the architect.